UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BLOOMBERG L.P.,<br>            *Plaintiff*,<br><br>            v.<br><br>FEDERAL TRADE COMMISSION,<br>            *Defendant*. | Civ. A. No. 22-3309 (RC) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant, the Federal Trade Commission ("FTC" or "Commission"), by its undersigned

attorneys, respectfully moves the Court, pursuant to Fed. R. Civ. P. 56, for an order granting

summary judgment in the Commission's favor because no genuine issue as to any material fact

exists and the Commission is entitled to judgment as a matter of law.  In support, the

Commission submits the accompanying Declarations of Holly Vedova and Elizabeth Tucci (and

attached exhibits), statement of material facts, and memorandum in support.

A proposed order consistent with the relief sought in this action is attached.

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ *John Moustakas*
JOHN MOUSTAKAS, D.C. Bar #442076
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2518

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLOOMBERG L.P.,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION,

*Defendant*.

Civ. A. No. 22-3309 (RC)

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Defendant the Federal Trade Commission ("FTC")

submits this statement of undisputed material facts.  The information herein is largely repeated

from the Declarations of Holly Vedova and Elizabeth Tucci.

**I.     Background**

1.     The FTC is charged with protecting the public from deceptive or unfair business

practices and from unfair competition. *See* Declaration of Holly Vedova ¶ 5 ("Vedova Decl.").

2.     The FTC's Bureau of Competition has primary responsibility in the agency for

enforcing Section 5 of the FTC Act, 15 U.S.C. § 45, and the federal antitrust laws, including

Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Hart-Scott-Rodino Antitrust Improvements

Act, 15 U.S.C. § 18a ("HSR Act").  *Id.*

3.     The Bureau of Competition carries out its responsibilities by investigating alleged

violations of the law, recommending to the Commission such further steps as may be

appropriate, and prosecuting enforcement actions the Commission authorizes. *See* 16 C.F.R.

§ 0.16.  *Id.*

4.      Along with the Antitrust Division of the United States Department of Justice ("DOJ"), the FTC is charged with investigating proposed mergers to determine if they violate antitrust laws.  *Id.* ¶ 6.

5.      Under the HSR Act, companies are required to provide advance notice to the FTC and DOJ of certain mergers or acquisitions above a certain threshold (currently, the size-of-transaction threshold is $111.4 million).  *Id.* ¶ 7.

6.      Parties to covered transactions must submit premerger notification to both the FTC and DOJ, which includes an HSR form entitled "Notification and Report Form for Certain Mergers and Acquisitions" with information about each company's business" ("HSR Filing" or "Merger Filing").  *Id.  See also* https://www.ftc.gov/enforcement/premerger-notification-program.

7.      The FTC's Premerger Notification Office receives the HSR Filing/Merger Filing and administers the program.  *Id.* ¶  7.

8.      After the parties submit their Filing/Merger Filing, the HSR Act gives the FTC and DOJ 30 days (or 15 days for reasons not relevant to this case) to decide whether to seek clearance from the other agency in order to conduct an initial investigation and determine whether additional information is needed to evaluate the transaction."  *Id.*  (citing 15 U.S.C. §18a(a), (b).

9.      The parties to a proposed merger may not consummate their transaction until after the HSR waiting period has expired.  *Id.*

10.      If either the FTC or the DOJ seeks additional information and documents—issuing what is known as a "Second Request" to each merging party—the HSR waiting period is

extended and the transaction is kept on hold until the companies have fully complied with that investigatory request. *Id.* ¶ 8.

11.     Once the parties have submitted all requested additional information, the reviewing agency has 30 days (or 10 days for reasons not relevant to this case) to file a complaint challenging the proposed merger ahead of its consummation. *Id.* (citing 15 U.S.C § 18a(e)).

12.     This process is designed to give the FTC and DOJ time to identify illegal mergers before they take place. *Id.* ¶ 9.

13.     Nonetheless, the law permits the agencies to determine that a merger is illegal and initiate antitrust enforcement even after the transaction has been consummated.  *Id.* (citing 15 U.S.C § 18 (Clayton Act)).

14.     This is especially important because the time periods incorporated in the HSR process are often too short for the agencies to determine whether a transaction is illegal, given the complexity of many transactions in the modern economy.  *Id.*

15.     When the agencies do not challenge a merger before its consummation, that does not constitute an approval or clearance of the deal; the agencies maintain the right to later challenge it, should further investigation show that the public interest so requires.  *Id.*

## II.     The FTC's Pre-Consummation Warning Letters

16.     In 2021, a substantial increase in the number of merger filings put significant pressure on the FTC's resources, making it difficult to thoroughly investigate deals ahead of the HSR Act deadlines.  *Id.* ¶ 10.

17.     As a result, the agency began sending out letters to certain HSR filers prior to the expiration of the HSR waiting period, alerting the filers that the FTC's investigation remained

open and reminding them that the agency may subsequently determine that their deal was unlawful even after the HSR review period expires. *Id.*

18.     The Director of the FTC's Bureau of Competition, Holly Vedova, announced this new practice and explained these considerations in a blog post on August 3, 2021. *Id.* ¶ 11 (citing Exhibit A to Vedova Decl. ("Blog Post"))[1] As Vedova explained:

> This year, the FTC has been hit by a tidal wave of merger filings that is straining the agency's capacity to rigorously investigate deals ahead of the statutory deadlines. . . For deals that we cannot fully investigate within the requisite timelines, we have begun to send standard form letters alerting companies that the FTC's investigation remains open and reminding companies that the agency may subsequently determine that the deal was unlawful. Companies that choose to proceed with transactions that have not been fully investigated are doing so at their own risk. Of course, this action should not be construed as a determination that the deal is unlawful, just as the fact that we have not issued such a letter with respect to an HSR filing should not be construed as a determination that a deal is lawful.

Exhibit A at 1.

19.     The blog post attached a sample of this kind of "pre-consummation warning letter," with placeholders for information such as company name, counsel name and address, and investigation file number.  Vedova Decl. ¶12 (citing Exhibit B to Vedova Decl. at 1 ("Sample Letter")).[2]

20.     The letters actually sent out use the form letter text with only minor modifications to tailor the letter to the specific recipient.  Vedova Decl. ¶12.

---

[1]     *See* https://www.ftc.gov/enforcement/competition-matters/2021/08/adjusting-merger-review-deal-surge-merger-filings (Aug. 3, 2021).

[2]     *See* https://www.ftc.gov/system/files/attachments/blog_posts/Adjusting%20merger%20review%20to%20deal%20with%20the%20surge%20in%20merger%20filings/sample_pre-consummation_warning_letter.pdf

**III.    Bloomberg's FOIA Request and the FTC's Response**

22.     On June 23, 2022, Leah Nylen, an antitrust reporter with Bloomberg News, submitted to the FTC a FOIA request in the name of Bloomberg, L.P. requesting "pre-consummation warning letters issued by the agency since July 2021 as disclosed in" the August 3, 2021, Blog Post.  *See* Declaration of Elizabeth Tucci ¶ 8 (hereinafter 'Tucci Decl.").

23.     The FTC's FOIA unit assigned FOIA request number 2022-01204 to the request. *Id.* & Exhibit A attached thereto.

24.     Bloomberg's FOIA request at issue in this case – No. 2022-01204 – was the third FOIA request that FTC had received regarding these pre-consummation warning letters.  *See* Tucci Decl. ¶ 9.

25.     The first FOIA request for these warning letters was made in September 2021, given FOIA request number 2021-01365, and was refused because they were considered confidential records relating to a non-public agency investigations.  *Id.* ¶ 10

26.     Specifically, the records sought pursuant FOIA request number 2021-01365 were deemed exempt from disclosure under Exemption 7(A), which protects "records or information compiled for law enforcement purposes" to the extent production "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  *Id.*

27.     Accordingly, on October 7, 2021, FOIA Assistant General Counsel Stearns denied request FOIA 2021-01365 in full, citing FOIA Exemption 7(A).  *Id.*

28.     The second such request for the same information was made on February 25, 2022, by Leah Nylen in connection with her employment by Politico, and given FOIA request number 2022-00664. *Id.* ¶ 11.

29.     In connection with this second request, a Government Information Specialist ("Specialist") in the FTC FOIA unit identified the prior request and determined, again, that these documents were exempt from disclosure under Exemption 7(A), and on March 3, 2022, Assistant General Counsel Stearns denied FOIA 2022-00664 in full. *Id.*

30.     When Bloomberg's request was received, an attorney in the FOIA unit began the search for responsive records in FOIAXpress and discovered the two previously processed FOIA requests referenced immediately above.  SUMF ¶¶ 25-29.  It was compared against the prior two requests made by other requesters, and determined likewise to be exempt from disclosure under Exemption 7(A).  Tucci Decl. ¶¶10-12.

31.     After review of the correspondence regarding requests 2021-01365 and 2022-00664, in June 2022, the FOIA unit determined that the records responsive to Bloomberg's request (FOIA 2022-01204) likewise were exempt from disclosure under Exemption 7(A).  *Id.* ¶ 12.

32.     The pre-consummation letters that Bloomberg requested reflect information that the merging parties submitted to the FTC pursuant to the HSR process, such as company name, counsel name, and other details related to certain proposed corporate mergers.  *See* Vedova Decl. ¶ 14.

33.     That information (referenced above) is strictly confidential and expressly exempt from FOIA disclosure because it was provided to the agency pursuant to the HSR process.  *Id. See also* 15 U.S.C. § 18a(h).

34.     The investigations as to which the pre-consummation warning letters pertain remain open.  *Id.*

35.    Disclosure could harm these investigations and any potential enforcement actions. *Id.*

36.    Accordingly, on June 28, 2022, by letter, Assistant General Counsel Stearns denied Bloomberg's request, explaining that disclosure of these letters "could reasonably be expected to interfere with the conduct of the Commission's law enforcement activities." *See* Tucci Decl. ¶ 12 & Exhibit B attached therefore (hereinafter, "Stearns Letter").

## IV.    Bloomberg's Administrative Appeal

37.    Bloomberg filed an administrative appeal on July 15, 2022, arguing that the withheld records were not compiled for law enforcement purposes and therefore were not covered by Exemption 7(A).  Tucci Decl. ¶14 & Exhibit C attached thereto (administrative appeal letter).

38.    Bloomberg's FOIA request and the initial determination of the FTC's FOIA Unit were reviewed on appeal, resulting in affirmance of the FOIA Unit's determination that the records were exempt from disclosure.  *Id.* ¶ 15.

39.    The denial of Bloomberg's appeal was communicated by letter of August 5, 2022. *Id.* & Exhibit D attached thereto ("FTC Appeal Letter").

40.    The denial letter explained that pre-consummation warning letters had been correctly protected under Exemption 7(A) and, if released, would reveal important details about ongoing investigations, compromising those investigations and potential enforcement actions. *Id.* ¶ 16 & FTC Appeal Letter at 1-2.

41.    The denial also explained that the records were likewise entitled to protection under Exemption 3 because the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act") expressly provides that "[a]ny information or documentary material filed with [the FTC]

pursuant to this section shall be exempt from disclosure under section 552 of Title 5" (i.e.,

FOIA). 15 U.S.C. § 18a(h) ("Section 18a(h)").  *Id.* ¶ 17; FTC Appeal Letter at 2-3.

## V.      Strict Confidentiality of HSR Information

42.      Information submitted to the FTC through the HSR process is strictly confidential

and may not be disclosed through FOIA.  *See* Vedova Decl. ¶ 15.

43.      The HSR Act expressly provides that "[a]ny information or documentary material

filed with [the FTC] pursuant to this section shall be exempt from disclosure under section 552

of Title 5" (i.e., FOIA).  *Id.* (citing 15 U.S.C. § 18a(h)).

44.      Consistent with the statute, the Commission's Premerger Notification Office has

issued public guidance confirming that "HSR filings are exempt from public disclosure" and

that, apart from the required publication of early termination notices, FTC staff "cannot provide

any information as to whether or not [an HSR] filing has been made." *Id.* ¶ 16; 1806004 Informal

Interpretation dated June 21, 2018 (emphasis added), https://www.ftc.gov/legal-library/browse/

hsr-informal-interpretations/1806004.

45.      Even the existence of an investigation as to any particular company or transaction

is itself highly confidential information.  *Id.* ¶ 17.

46.      Under applicable rules, FTC investigations (merger as well as non-merger) are

generally nonpublic. *See id.* (citing FTC Rule 2.6, 16 C.F.R. §2.6).

47.      There are strict limitations on when and how FTC staff may disclose the existence

of an investigation to potential witnesses or other third parties—typically only "to the extent

necessary to advance the investigation." *Id*.

48.      And even in those necessary communications to advance a merger investigation,

FTC staff is prohibited from referencing the fact that any party made an HSR filing.  *Id.*

49.     The FTC relies on market participants' cooperation at various stages of the investigation and litigation process, including as to proposed mergers: to gather documents, conduct phone interviews, sign witness affidavits, and assist the agency in other ways.  *Id.* ¶ 18.

50.     To secure this cooperation, staff routinely asserts that the agency will keep provided information confidential to the full extent of agency rules and applicable law.  *Id.*

51.     In addition, advance information about a planned merger is highly coveted by the press, financial analysts, corporate employees, and many others.  *Id.* ¶ 19.

52.     Corporate transactions large enough to require HSR filings almost invariably have major consequences for employees, competitors, consumers, investors, those with business dealings with the affected companies, and other constituencies.  *Id.*

53.     Merging parties seek to control the information flow relating to their deal to the public, their employees, and other stakeholders.  *Id.* ¶ 20.

54.     The parties themselves typically decide whether, when, and how notice of a proposed transaction is made public.  *Id.*

**VI.     Serious Harm From Disclosure**

55.     HSR filers made their filings with every expectation that their information would be kept strictly confidential and exempt from FOIA. *Id.* ¶ 21.

56.     Producing these letters would disclose not only the existence of the proposed transaction but also that the FTC has not yet completed its investigation, i.e., that the FTC may view the deal as problematic.  *Id.*

57.     If the government's merger investigation is still ongoing, whether or not the merger has been consummated, premature disclosure of the information in the pre-consummation warning letters could: (1) result in third-party interference that could affect market behavior in a

way that could undermine investigation or enforcement; (2) instigate non-germane input from outside sources, which could divert resources from the focus of the investigation or enforcement action; (3) harm the competitive viability of the merging parties' business operations, including those potentially appropriate for divestiture relief; (4) harm investigation into potential remedies, including third-party inquiries into or negotiations involving divestiture relief; and (5) make parties and third parties less inclined to engage or cooperate with staff out of fear that the agency will not keep their sensitive business information confidential.

58.     Disclosure could, for example, lead industry analysts or market participants previously unaware of the deal to publish reports or take actions that might undermine the government's market definition to suit their own interests.  *Id.* ¶ 23.

59.     Disclosure also would make HSR review less efficient, creating opportunities for others to interfere with the FTC's investigation in ways that could divert resources or make staff's work more difficult.  *Id.* ¶ 26.

60.     Promoting efficiency in the HSR process is even more important in the current environment, when the agency's resources are stretched thin.  *Id.*

61.     More broadly, if the agency is forced to reveal information historically kept confidential (whether by statute, rule, or agency practice), it will erode trust with market participants, who may question whether the agency will adequately safeguard their information.  *Id.* ¶ 27

62.     Reduced cooperation may prevent staff from developing antitrust cases in a timely manner. *Id.*

## VII.    Early Termination Notices

63.     "Early termination notices" have been issued by the FTC when a merging party has requested early termination of the HSR waiting period.  *Id.* ¶ 28.

10

64.     "Early termination notices" are issued by the FTC when it agrees the merger does not pose competitive concerns.  *Id.*

65.     "Early termination notices" are published in the Federal Register pursuant to the HSR Act, 15 U.S.C. § 18a(b)(2), which states:

> The Federal Trade Commission and the Assistant Attorney General may, in individual cases, terminate the waiting period specified in paragraph (1) and allow any person to proceed with any acquisition subject to this section, and promptly shall cause to be published in the Federal Register a notice that neither intends to take any action within such period with respect to such acquisition.  *Id.*

66.     "Early termination notices" are issued when an investigation is terminated.  *Id.*

67.     "Early termination notices" are required by statute to be publicly posted.  *Id.*

**VIII.  Foreseeable Harm and Segregability**

68.     The release of recipient-specific information from pre-consummation warning letters would result in foreseeable harm.  *See* Vedova Decl. ¶¶ 14, 21-27.

69.     The FTC considered its obligation to segregate in this case.  Segregating the recipient-specific information and producing redacted versions of the letters would amount to producing copies of the already-public form letter.  Bloomberg did not request that the FTC undertake such a superfluous exercise.  *See* Tucci Decl. ¶ 20.

70.     Bloomberg is either in possession of or has ready access to the form letter that is the template for the pre-consummation warning letters.  The form letter was posted on the FTC's website with the August 3, 2021 blog post.  *Id.*

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/
JOHN MOUSTAKAS, D.C. Bar #442076
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
 (202) 252-2518
john.moustakas@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLOOMBERG L.P., | |
| *Plaintiff,* | |
| v. | Civ. A. No. 22-3309 (RC) |
| FEDERAL TRADE COMMISSION, | |
| *Defendant*. | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this action filed under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), plaintiff Bloomberg L.P. seeks letters sent by Defendant Federal Trade Commission ("FTC," "Commission") to companies under ongoing investigation by the agency under federal antitrust laws. These companies had filed confidential notices with the Commission under the Hart-Scott-Rodino Antitrust Improvements Act ("Hart-Scott-Rodino Act"), 5 U.S.C. § 18a, informing the agency of their plans to merge. Under that statute, the identities of the filing companies and any information they provide to the Commission are strictly confidential and are expressly exempt from FOIA disclosure. The letters Bloomberg seeks state that the Commission's antitrust investigation remains ongoing and that, if the companies proceed with their merger, they do so at their own risk. Producing these letters would both disclose statutorily protected confidential information and compromise open, nonpublic Commission investigations and future enforcement actions. The Commission correctly withheld the letters under FOIA Exemptions 3 and 7(A), and is entitled to summary judgment in this action.

# BACKGROUND

## I.    The Hart-Scott-Rodino Act Program and the Recent Surge In Merger Filings

The Commission is charged with protecting the public from deceptive or unfair business practices and from unfair competition.  *See* Def.'s Statement of Undisputed Material Fact (hereinafter "SUMF") ¶ 1.  The Commission's Bureau of Competition has primary responsibility in the agency for enforcing Section 5 of the FTC Act, 15 U.S.C. § 45, as to antitrust violations and the federal antitrust laws, including Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Hart-Scott-Rodino Act.  *Id.* ¶ 2.  The Commission's Bureau of Competition carries out its responsibilities by investigating alleged violations of the law, recommending to the Commission such further steps as may be appropriate, and prosecuting enforcement actions the Commission authorizes. *See* 16 C.F.R. § 0.16.  *See also* SUMF ¶ 3.  One of the agency's responsibilities, shared with the Department of Justice, is investigating proposed mergers to determine if they violate the antitrust laws.  *Id.* ¶ 4.

Under the Hart-Scott-Rodino Act, companies are required to provide advance notice to the Commission and the Justice Department (collectively, the "Antitrust Agencies") of certain mergers or acquisitions above a certain threshold (currently, $111.4 million).  *Id.* ¶ 5.  The Commission's Premerger Notification Office administers this program.  *Id.* ¶ 7.  Parties to covered transactions must submit premerger notification to both Antitrust Agencies, which includes a Hart-Scott-Rodino Act form entitled "Notification and Report Form for Certain Mergers and Acquisitions" with information about each company's business ("Hart-Scott-Rodino Filing" or "Merger Filing").  *Id.* ¶ 6. *See also*  https://www.ftc.gov/enforcement/ premerger-notification-program.

After the merging parties submit a Merger Filing, the Hart-Scott-Rodino Act generally gives the Antitrust Agencies 30 days to pursue an initial investigation and determine whether

additional information is needed to evaluate the transaction.  15 U.S.C. § 18a(b).  SUMF ¶ 8.  If either Antitrust Agency seeks additional information by issuing "Second Requests" to the merging parties, the deal is then put on hold until the companies have fully complied with that investigatory request.  *Id.* ¶ 10 (citing 15 U.S.C. § 18a(e)).  Once the parties have submitted all requested additional information, the reviewing agency has a specified number of days to file a complaint challenging the proposed merger prior to its consummation. *Id.* ¶ 11.  The parties may not consummate their transaction until after the Hart-Scott-Rodino Act waiting period has expired. *Id.* ¶ 9.

This process is designed to give the Antitrust Agencies time to identify illegal mergers before they take place.  *Id.* ¶ 12.  However, the law permits the Antitrust Agencies to determine that a merger is illegal and initiate antitrust enforcement even after the Hart-Scott-Rodino Act waiting period has expired, including if the transaction has been consummated.  *See id.* ¶13.  This is especially important because the complexity of many transactions in the modern economy often means the Antitrust Agencies require more time to fully investigate a deal.  *Id.* ¶ 14.  When the Antitrust Agencies do not challenge a merger before the Hart-Scott-Rodino Act waiting period expires, that does not constitute an approval or clearance of the deal; the agencies maintain the right to later challenge it, should further investigation show that the public interest so requires.  *Id.* ¶ 15.

In 2021, a substantial increase in the number of merger filings put significant pressure on the Commission's resources, making it difficult to thoroughly investigate deals ahead of the Hart-Scott-Rodino Act deadlines.  SUMF ¶ 16.  As a result, the agency began sending out letters to certain Hart-Scott-Rodino Act filers prior to the expiration of the waiting period, alerting them that the Commission's investigation remained open and reminding them that the agency may

subsequently determine that their deal was unlawful even after the Hart-Scott-Rodino Act review period expires. *Id.* ¶17. The Director of the Commission's Bureau of Competition, Holly Vedova, announced this new practice in a blog post on August 3, 2021. *Id.* ¶ 18 and Exhibit A attached thereto ("Blog Post"). As she explained:

> This year, the FTC has been hit by a tidal wave of merger filings that is straining the agency's capacity to rigorously investigate deals ahead of the statutory deadlines. . . For deals that we cannot fully investigate within the requisite timelines, we have begun to send standard form letters alerting companies that the FTC's investigation remains open and reminding companies that the agency may subsequently determine that the deal was unlawful. Companies that choose to proceed with transactions that have not been fully investigated are doing so at their own risk. Of course, this action should not be construed as a determination that the deal is unlawful, just as the fact that we have not issued such a letter with respect to an HSR filing should not be construed as a determination that a deal is lawful.

Blog Post at 1. The blog post attached a sample of this kind of "pre-consummation warning letter," with placeholders for information such as company name, counsel name and address, and investigation file number. *See* SUMF ¶ 19; Vedova Decl., Exhibit B ("Sample Letter") at 1.

## II.    **Bloomberg's FOIA Request**

On June 23, 2022, Bloomberg submitted a FOIA request to the Commission requesting "pre-consummation warning letters issued by the agency since July 2021 as disclosed in" the Commission's August 3, 2021, blog post.[1] *Id.* ¶ 22. The Commission's FOIA unit assigned number 2022-01204 to the request. *Id.* ¶ 23; Tucci Decl., Exhibit A.

The FOIA unit promptly searched its database and identified the responsive records, *id.* ¶ 30, and determined that they were exempt from disclosure under Exemption 7(A), which protects "records or information compiled for law enforcement purposes" to the extent

---

[1]     *See* "Adjusting merger review to deal with the surge in merger filings," https://www. ftc.gov/enforcement/competition-matters/2021/08/adjusting-merger-review-deal-surge-merger-filings (Aug. 3, 2021).

production "could reasonably be expected to interfere with enforcement proceedings." *Id.* (citing 5 U.S.C. § 552(b)(7)(A)).  Two prior FOIA requests, from other requesters, had sought the same pre-consummation warning letters, and both had been denied on Exemption 7(A) grounds.  *Id.* ¶¶ 25-29. Accordingly, on June 28, 2022, the Commission's Assistant General Counsel Dione Stearns fully denied Bloomberg's request, explaining that disclosure of these letters "could reasonably be expected to interfere with the conduct of the Commission's law enforcement activities." *Id.* ¶ 36; *see also* Tucci Decl., Exhibit B at 1 ("Stearns Letter.").  Bloomberg filed a timely administrative appeal, arguing that the withheld records were not compiled for law enforcement purposes and therefore were not covered by Exemption 7(A).  SUMF ¶ 37; Tucci Decl., Exhibit C ("Administrative Appeal").

On August 15, 2022, the Commission denied the administrative appeal, agreeing with the FOIA unit's initial determination that the records were covered by Exemption 7(A).  SUMF ¶¶ 38-39; Tucci Decl., Exhibit D ("Appeal Letter").  The Appeal Letter explained that if the requested letters were released, they would reveal important details about ongoing investigations, compromising those investigations and potential enforcement actions.  Appeal Letter at 2; SUMF ¶ 40.  It also determined that the records were protected by Exemption 3 because section 18a(h) of the Hart-Scott-Rodino Act expressly provides that "[a]ny information or documentary material filed with [the Commission] pursuant to this section shall be exempt from disclosure under section 552 of Title 5" (i.e., FOIA).  *See* SUMF ¶ 41; Appeal Letter at 2-3.

Unsatisfied with the result of its administrative appeal, Bloomberg then filed this action. Compl. (ECF No. 1).

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  It is up to the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  A genuine issue is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Id.*

"[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment.") (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)).  A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983).  "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d

724, 738 (D.C. Cir. 1981)).  "[A]n agency's justification for invoking a FOIA exemption is

sufficient if it appears 'logical' or 'plausible.'"  *Media Rsch. Ctr.*, 818 F. Supp. 2d at 137

(quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

Once the court determines that an agency has released all non-exempt, reasonably

segregable material, it has no further judicial function to perform under FOIA and the FOIA claim

is moot.  *See Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982).

## ARGUMENT

Public access to government documents is the fundamental principle that animates FOIA.

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989).  "Congress recognized,

however, that public disclosure is not always in the public interest."  *CIA v. Sims*, 471 U.S. 159,

166-67 (1985).  FOIA thus "represents a balance struck by Congress between the public's right

to know and the government's legitimate interest in keeping certain information confidential."

*Ctr. for Nat'l Sec. Studies v. Dep't of Just.,* 331 F.3d 918, 926 (D.C. Cir. 2003); *John Doe

Agency*, 493 U.S. at 152.  Under FOIA, disclosure is required unless the requested information

falls within one of nine enumerated exemptions.  *See* 5 U.S.C. § 552(b).  The government bears

the burden of proving that the withheld information falls within the exemptions it invokes.

5 U.S.C. § 552(a)(4)(B).  Courts, in turn, must be sure to give each exemption "a meaningful

reach and application." *John Doe Agency*, 493 U.S. at 152.  Thus, the Supreme Court recently

rejected the notion that FOIA must be construed with a thumb on the scale in favor of disclosure,

holding that courts must give FOIA not a broad or narrow reading, but only "a fair reading."

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).  The Court explained

that FOIA's "exemptions are as much a part of [its] purposes and policies as the statute's

disclosure requirement." *Id.* (cleaned up).

I.      **The Commission Conducted an Adequate Search For The Responsive Records**

In response to a FOIA request, an agency is required to make a good faith effort to

conduct a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v.*

*Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). "The adequacy of an agency's search is

measured by a 'standard of reasonableness,'" and depends on the circumstances of each case. *Id.*

(quoting *McGehee v. CIA*, 697 F.2d 1095, 1100-01 (D.C. Cir. 1983)).

The Commission's search in response to Bloomberg's FOIA request plainly was

sufficient.[2]  Commission staff promptly searched the electronic database of all pending and

closed FOIA requests and learned that two previous requests recently had sought the same

records.  Both had been denied in full, relying on Exemption 7(A).  *See* SUMF ¶¶ 25-29.  Staff

had contacted the head of the office where the responsive records were housed, confirmed that

the letters indeed were confidential andwere issued in connection with open, non-public agency

investigations, and determined that the letters were exempt from disclosure. *Id.* ¶ 31; *see also*

SUMF ¶¶ 22-36.  These efforts were "reasonably calculated to uncover all relevant documents"

under this Court's standard. *Weisberg*, 705 F.2d at 1351.

II.     **The Commission Properly Withheld The Records Pursuant To FOIA Exemptions**

Two separate FOIA exemptions apply to the pre-consummation warning letters. Each

exemption independently justifies the FTC's withholding of the letters under FOIA.

A.      **The Commission Correctly Withheld the Letters Under Exemption 3**

Aware that "'legitimate governmental and private interests could be harmed by release of

certain types of information,'" *Dep't of Just. v. Julian*, 486 U.S. 1, 8 (1988) (citation omitted),

---

[2]      Bloomberg does not contend that the Commission's search was inadequate, *see* Compl.
¶¶ 13-15, instead focusing on whether the responsive documents are exempt.  The Commission,
nonetheless, briefly addresses this issue out of an abundance of caution and in the interest of
completeness.

Congress counterbalanced FOIA's disclosure provisions by exempting certain information. Thus, Exemption 3 permits an agency to withhold any information that is "specifically exempted from disclosure by statute." 5 U.S.C. 552(b)(3). To invoke exemption 3, an agency must demonstrate "that a statute exists that either requires that matters be withheld from the public 'in such a manner as to leave no discretion on the issue' or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'" *Nat. Res. Def. Council, Inc. v. Def. Nuclear Facilities Safety Bd.*, 969 F.2d 1248, 1251 (D.C. Cir. 1992) (quoting *id.*). The Hart-Scott-Rodino Act, in turn, leaves no discretion to the agency, instead providing unequivocally that "[a]ny information or documentary material filed with the . . . Federal Trade Commission pursuant to this section shall be exempt from disclosure under section 552 of Title 5," which is the FOIA statute. 15 U.S.C. §18a(h). That includes information submitted to the FTC as part of any required premerger notification process. *See Mattox v. FTC*, 752 F.2d 116, 119-24 (5th Cir. 1985); *see also Lieberman v. FTC*, 771 F.2d 32, 37-40 (2d Cir. 1985).

Section 18(a)(h) makes plain that "Congress envisioned that only the Department of Justice and the FTC would use premerger information." *Lieberman*, 771 F.2d at 39. This restriction is not merely temporal—it prohibits disclosure even after the transaction (or the Commission's investigation) closes. *See* 15 U.S.C. §18a(h).  Nor is it waived by the parties' own disclosure of the withheld information.  *Id.*

Consistent with the statute, the Commission's Premerger Notification Office has issued public guidance confirming that Hart-Scott-Rodino Act "filings are exempt from public disclosure" and that, apart from the required publication of early termination notices (discussed *infra*, at 13), Commission staff "cannot provide *any* information as to whether or not [an Hart-Scott-Rodino Act] filing has been made." 1806004 Informal Interpretation dated June 21, 2018

(emphasis added), https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/ 1806004; SUMF ¶ 44.

No court has ever permitted disclosure of the Hart-Scott-Rodino Act information requested in this case.  In light of the clear statutory language, that result is hardly surprising.  To the contrary, the Second Circuit has recognized that Congress, through Section 18a(h), made it "crystal clear" that premerger "information could not be disclosed under FOIA." *Lieberman*, 771 F.2d at 38 & n. 14 ("Much of the legislative history simply reveals the obvious; Congress wanted premerger information kept confidential."). The Fifth Circuit likewise has emphasized that the Hart-Scott-Rodino Act "exempts all information submitted to the FTC and the Justice Department from disclosure under the Freedom of Information Act and requires that no such information or material be made public with two stated exceptions for Congress and its committees." *Mattox*, 752 F.2d at 122. Indeed, these courts have held that the Commission may not disclose Hart-Scott-Rodino Act information even on a confidential basis to state and law enforcement officials (much less to the general public through FOIA). *See id.* at 118-24; *Lieberman*, 771 F.2d at 37-40; *see also Pharm. Research & Mfrs. of Am. v. FTC*, 44 F. Supp. 3d 95, 131-32 (D.D.C. 2014) (noting that these "two cardinal cases discussing § 18a(h)" both "concluded that the FTC shall not disclose [Hart-Scott-Rodino Act] information, even on a 'confidential' basis").

Here, the very existence of a premerger investigation is itself highly confidential.  *See* Vedova Decl. ¶ 17. As a leading manual on premerger notification practice explains:

> The [FTC's Premerger Notification Office] consistently has taken the position that the fact that an [Hart-Scott-Rodino Act] filing has been made is itself information . . . filed with [the FTC] pursuant to this section' and therefore exempt from disclosure under [FOIA] . . . The Act expressly provides that [a]ny information or documentary material filed' with the FTC and the [Justice Department] under the [Hart-Scott-Rodino] Act is exempt from disclosure under

> FOIA and may not be made public except as may be relevant to any
> administrative or judicial action or proceeding.

Am. Bar Ass'n, *Premerger Notification Practice Manual* § 169, at 296-97 (5th ed. 2015)

(cleaned up); *see also* October 4, 2013 Discussion on How to Define Confidential Information,

Organisation for Economic Co-operation and Development, https://www.justice.gov/atr/file

/787991/download (noting the Antitrust Agencies "have consistently interpreted" Section 18a(h)

"as applying not only to information" in Hart-Scott-Rodino Act filings, "but also regarding

whether an HSR filing has been made" and the "date the waiting period expires").

      Understanding why this information is so tightly guarded is not hard. Advance

information about a future planned merger is highly coveted by the press, financial analysts,

corporate employees, and many others.  SUMF ¶ 51.  Corporate transactions large enough to

require Hart-Scott-Rodino Act filings are "likely to affect the entire national economy."  *See*

*Mattox*, 752 F.2d at 122.  As such, putative mergers are expected to have major consequences for

employees, competitors, consumers, investors, those with business dealings with the affected

companies, and other constituencies.  *See* SUMF ¶ 52.  The Hart-Scott-Rodino Act's

"fundamental goal was to improve the efficiency of merger regulation," *id.*, and ensuring the

strict confidentiality of information submitted by merging parties was central to that overarching

goal.  *See* Vedova Decl. ¶¶ 15-20.[3]  Without that protection, the premerger review process would

become a chaotic free-for-all, with myriad third parties clamoring for merger information during

the Commission's time-sensitive investigation into matters consequential to the agency's

---

[3]    Congress understood that public access to confidential data could slow the premerger
review process and possibly compromise the confidential nature of information submitted by
merging companies, which is why Hart-Scott-Rodino Act contains a specific exception to FOIA.
*See, e.g.*, *The Second Circuit Finds No Place For State Participation In The Fast World Of
Mergers: Lieberman v. FTC*, 52 Brooklyn L. Rev. 591, 592 & n.6 (Spring 1986) (citing 122
CONG. REC. 15,812 (statement of Sen. Hruska) (1976)).

important mission—which would subvert the regulatory efficiency that Hart-Scott-Rodino Act was designed to achieve.  SUMF ¶¶ 48-54.

The pre-consummation warning letters requested here are protected under Exemption 3 through the Hart-Scott-Rodino Act.  These letters reflect information that their recipients had submitted to the Commission pursuant to the Hart-Scott-Rodino Act process, including company names, addresses, and other details related to the proposed transaction, all of which constitute "information or documentary material filed with" the Commission.  15 U.S.C. § 18a(h); *see* SUMF ¶¶ 42-47; 55-62.  The requested warning letters thus are exempt under the plain terms of Section 18a(h).

This analysis is unaffected by the fact that Bloomberg's FOIA request did not ask for the Hart-Scott-Rodino Act filings themselves, but rather sought other documents—the warning letters—that include information from those filings.  Section 18a(h) exempts "[a]*ny* information . . . filed with" the Commission during the Hart-Scott-Rodino Act process, not merely the filings themselves.  *Id*. (emphasis added).  And FOIA litigants may not obtain indirectly what they cannot obtain directly.  For example, where FOIA plaintiffs sought to obtain a list of terrorism detainees from the government, the D.C. Circuit refused to disclose either the detainee list or a list of the detainees' attorneys.  *See Ctr. for Nat'l Sec. Studies*, 331 F.3d at 933.  Even an attorney list, the Court explained, could enable the press and others to use various means to try to compile a list of the detainees themselves, which was exempt from disclosure.  *Id.*; *see also Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979) (information exempt where it could allow others to "extrapolate" protected confidential information); *Jud. Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) ("summaries or reformulations" of exempt information are also properly withheld); *Reps. Comm. for Freedom of Press v. FBI*, Civ.

A. No. 17-1701 (RC), 2022 WL 13840088, at *7 (D.D.C. Oct. 21, 2022) (accepting mosaic theory and upholding withholding where requester "could piece together this information to draw conclusions").

Moreover, withholding the letters in full is appropriate. The Commission publicly posted a form letter reflecting the general text of the letters that were sent out. *See* Sample Letter (Vedova Decl., Exhibit B). The only material differences between the withheld letters and the form letter are the company- and merger- specific information that is protected under Section 18a(h). *See* SUMF ¶ 19. Producing redacted versions of the letters thus would be a fruitless exercise, which Bloomberg has not, in any event, requested. *Id.* ¶ 20.  *See Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1068-69 (D.C. Cir. 2023) (to satisfy requirement to disclose "reasonably segregable" materials per 5 U.S.C. § 552(b), agency need not disclose "a redacted version of the [document] if the unredacted markings would 'have minimal or no information content'" beyond what is already publicly available (quoting *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977)).

In its Complaint (at ¶ 12), Bloomberg asserts that the Commission has previously "released to the public 'Early Termination Letters,' which disclose the identities of companies who filed premerger notification to the [Commission] under 15 U.S.C. §18a."  It appears that this assertion is designed to articulate a predicate for an argument about the Hart-Scott-Rodino Act information at issue in this case.  But the treatment of the "early termination notices" referenced by Bloomberg is irrelevant to the withholding of the "pre-consummation warning letters" at issue here.  The former notices are issued by the Commission when a merging party has requested early termination of the Hart-Scott-Rodino Act waiting period, and the agency agrees the merger does not pose competitive concerns. *See* SUMF ¶¶ 63-64.  Indeed, early termination notices are

published in the Federal Register pursuant to the Hart-Scott-Rodino Act, 15 U.S.C. § 18a(b)(2), which states:

> The Federal Trade Commission and the Assistant Attorney General may, in individual cases, terminate the waiting period specified in paragraph (1) and allow any person to proceed with any acquisition subject to this section, and promptly shall cause to be published in the Federal Register a notice that neither intends to take any action within such period with respect to such acquisition.

*Id.* ¶ 65.  In short, early termination notices are issued when an investigation is terminated and are required by statute to be publicly posted. *Id.* ¶¶66-67.  The pre-consummation warning letters, by contrast, are issued during ongoing investigations and are nonpublic, and their disclosure would reveal statutorily protected Hart-Scott-Rodino Act information (the identity of the filer, for example).  *See* SUMF ¶¶ 56-62; Vedova Decl. ¶ 28. The two types of documents are apples and oranges, and are subject to entirely different FOIA treatment.

Foreseeable harm to the interests Exemption 3 exists to prevent would result from the release of recipient-specific information from the pre-consummation warning letters sought in this case.  *See* SUMF ¶ 68.  The Commission is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. United States Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  In any case, because Bloomberg either possesses or may readily obtain from the public domain that portion that might have otherwise been eligible for release after segregation, the Commission was not required to engage in the superfluous exercise of segregation here.  *Id.* ¶¶ 69-70.  Consequently, for the foregoing reasons, withholding the pre-consummation warning letters pursuant to Exemption 3 was proper, and summary judgment should be granted in Defendant's favor on that basis.

**B.      The Commission Correctly Withheld The Letters Under Exemption 7(A)**

Exemption 7 permits an agency to withhold certain classes of documents compiled for law enforcement purposes, including documents whose disclosure "(A) could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A); *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978); *Ctr. for Nat'l Sec. Studies,* 331 F.3d at 926. "The principal purpose of Exemption 7(A) is to prevent disclosures which might prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence." *Maydak v. Dep't of Just.*, 218 F.3d 760, 762-63 (D.C. Cir. 2000) (citing *Robbins Tire*, 437 U.S. at 227, 241-42). A "law enforcement purpose" exists where there is a "rational nexus" between the requested document and a law enforcement duty of the agency and where there is "a connection between an individual or incident and a possible . . . violation of federal law." *See Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926. The enforcement proceedings need not be currently ongoing; it suffices for them to be "reasonably anticipated." *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993).

As a threshold matter, the Commission is a law enforcement agency responsible, among other things, for enforcing federal antitrust laws that prohibit anticompetitive mergers.  *See* https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers.  *See also FTC v. Weyerhaeuser*, 665 F.2d 1072, 1084 (D.C. Cir. 1981); *Appeal of FTC Line of Bus. Report Litig.,* 595 F.2d 685, 702 (D.C. Cir. 1978).  Law enforcement investigation documents, including the Commission's, are exempt from disclosure in response to a FOIA request.  *See, e.g.*, *Carter, Fullerton & Hayes, LLC v. FTC*, 601 F. Supp. 2d 728, 740 (E.D. Va. 2009);

*Fedders Corp. v. FTC*, 494 F. Supp. 325, 328 (S.D.N.Y. 1980), *aff'd*, 646 F.2d 560 (2d Cir. 1980).

There can be no reasonable dispute that the pre-consummation warning letters were compiled "for law enforcement purposes," 5 U.S.C. § 552(b)(7)(A).  The purpose of each merger investigation under the Hart-Scott-Rodino Act is to determine whether the Commission should bring an enforcement proceeding to block or limit the proposed transaction. The letters are missives to companies that filed premerger notifications, communicating that the Commission's investigation is ongoing and that the agency has not yet determined whether the merger would violate the antitrust laws (and whether the agency will file an enforcement action). Vedova Decl. ¶¶ 10-12. Where an affidavit states that an investigation remains ongoing, district courts in FOIA cases may "reasonably infer that [the] investigation may eventually lead to a prosecution"—*i.e.*, that the documents are sufficiently connected to a concrete prospective law enforcement proceeding.  *See, e.g.*, *Juarez v. Dep't of Just.*, 518 F.3d 54, 59 (D.C. Cir. 2008) (emphasizing that this requirement "is not quite the formidable hurdle appellant would make it out to be"). Here, there is a clear connection between the letters and the Commission's law enforcement duties, and between the companies and possible law violations.

Disclosing the letters also plainly "could reasonably be expected to interfere with" the Commission's pending or anticipated law enforcement proceedings, 5 U.S.C. § 552(b)(7)(A). *See* SUMF ¶¶ 55-62; Vedova Decl. ¶¶ 22-27. As the Supreme Court has explained, "the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against" by enacting Exemption 7(A). *Robbins Tire*, 437 U.S. at 232. As discussed, the identities of the merging companies and other information about the proposed merger is highly

sensitive information that the Commission keeps strictly confidential.  *See* SUMF ¶¶ 41-54;
Vedova Decl. ¶¶ 15-20.  Merging parties, too, often keep their plans secret and tightly protect
this information, even from their own employees.

Prematurely disclosing this information would compromise the agency's open
investigation by alerting the press, competitors, analysts, and others of the acquisition and the
Commission's ongoing scrutiny—triggering an avalanche of reactions that could lead to
intimidation or bias of potential witnesses, destruction of evidence, and meddlesome inquiries
that would tax already-stretched agency resources.[4]  *See* SUMF ¶¶ 55-62; Vedova Decl.
¶¶ 22-27.  As such, withholding the pre-consummation warning letter was proper.  *See, e.g.*,
*Maydak*, 218 F.3d at 762-63 (preventing witness harassment and intimidation was a goal of
Exemption 7(A)); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 929 (concerns of witness intimidation
and evidence tampering); *Mapother*, 3 F.3d at 1542-43 (disclosure could pose risk of evidence
fabrication). Even if the parties have publicly announced the merger, or the deal has closed,
disclosing the letters would reveal that the Commission may believe the transaction is unlawful
and may challenge it.  *See* Vedova Decl. ¶ 22.

For example, merger enforcement cases often turn on how the relevant markets are
defined, which sometimes depends on how market participants and industry observers
characterize the market.  Disclosure could lead industry analysts to publish reports that might
undermine the government's market definition, or, to suit their own interests, skew how courts or
the Commission view the transaction.  That could muddy the waters in any enforcement action
the Commission pursues.  *See* Vedova Decl. ¶ 25.  Likewise, if it becomes generally known that

---

[4]      Courts "must evaluate the risk of disclosing records to some particular FOIA requester
not simply in terms of what the requester might do with the information, but also in terms of
what anyone else might do with it."  *Swan v. SEC*, 96 F.3d 498, 499-500 (D.C. Cir. 1996).

the Commission is still investigating a merger, or that a business or division of either party might be divested, the affected employees may seek other employment or may be recruited away by third parties.  That could undermine the acquisition target's standalone prospects and, in turn, the Commission's ability to secure effective divestiture relief if it ultimately brings an enforcement action against the parties. *Id.* at ¶ 22-24.

Moreover, forced disclosure would damage the Commission's credibility with the business community and other stakeholders who depend on the agency's promises that certain information will be kept confidential.  *See* Vedova Decl. ¶¶ 18, 21-22, 27.  If there are questions as to the Commission's ability to keep such information secret, then merging parties as well as others may be less inclined to cooperate with the Commission's investigation or otherwise engage with the agency.  That, too, would harm the Commission's enforcement proceedings, which often depend heavily on such assistance:  Commission staff rely on market participants' cooperation at various stages of the investigation and litigation process—to gather documents, conduct interviews, sign witness affidavits, and more.  *Id.* ¶ 18.  And the Commission routinely invokes its confidentiality rules to secure this vital cooperation.  *Id.*  Disclosure would erode trust with market participants and would have a chilling effect on future information sharing and cooperation, making enforcement efforts more difficult. *Id.* ¶¶ 22-27.

That kind of chilling effect is well within the harm to law enforcement that Exemption 7(A) protects against. *Robbins Tire*, 437 U.S. at 241 (recognizing that the possible "chilling effect on the Board's sources" from disclosure "cannot be ignored"). Indeed, an important purpose of Exemption 7 was to protect against "the potential disruption in the flow of information to law enforcement agencies who might be deterred from speaking because of the prospect of disclosure."  *FBI v. Abramson*, 456 U.S. 615, 629-30 (1982); *see also Ctr. for Nat'l*

*Sec. Studies*, 331 F.3d at 930 (disclosure could make those affected "much less likely" to "cooperate with the investigation").

In short, this case involves ongoing investigations that could lead to "possible future" cases, which in turn "would be jeopardized by the premature release" of the requested information. *Juarez*, 518 F.3d at 59.  Foreseeable harm to the interests Exemption 7(A) exists to prevent would result from the release of recipient-specific information from the pre-consummation warning letters sought in this case.  See SUMF ¶ 68.  The Commission is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman* 494 F.3d at 1117.  In any case, because Bloomberg either possesses or may readily obtain from the public domain that portion that might have otherwise been eligible for release after segregation, the Commission was not required to engage in the superfluous exercise of segregation here. *Id.* ¶¶ 69-70.  Consequently, for the foregoing reasons, withholding the pre-consummation warning letters pursuant to Exemption 7(A) was proper, and summary judgment should be granted in Defendant's favor on that basis as well.

## **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court enter summary judgment on all claims in its favor.


Dated:  March 8, 2023
       Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ _____
    JOHN MOUSTAKAS, D.C. Bar #442076
    Assistant United States Attorney

19

601 D Street, NW
Washington, DC 20530
Telephone: (202) 252-2518
john.moustakas@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLOOMBERG L.P., | |
| *Plaintiff*, | |
| v. | Civ. A. No. 22-3309 (RC) |
| FEDERAL TRADE COMMISSION, | |
| *Defendant*. | |

## **[PROPOSED] ORDER**

UPON CONSIDERATION of Defendant's motion for summary judgment and Plaintiff's

cross-motion for summary judgment, and the entire record herein, it is hereby

ORDERED that Defendant's motion is GRANTED;

ORDERED that Plaintiff's cross-motion is DENIED;

ORDERED that summary judgment is hereby entered in favor of Defendant's on

Plaintiff's claims in this action.


SO ORDERED:


Dated: _____       _____
                                 UNITED STATES DISTRICT JUDGE